# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

## MAY v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. November 4, 1907.)

### No. 1,337.

1. WITNESSES—IMPEACHMENT—MATERIALITY OF EVIDENCE TO SHOW BIAS OR PREJUDICE.

A remark made by a witness in a criminal case out of court *held* to have no tendency to show bias or prejudice and properly excluded as immaterial, when offered to be shown for that purpose.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, § 1202.]

2. CRIMINAL LAW—EVIDENCE—DECLARATIONS BY ACCUSED.

Defendant was charged with having made a false entry in a report made to the comptroller of the currency as president of a national bank, in that he omitted from the statement of deposits for which the bank was liable the amount of a deposit made several years before and which had not been withdrawn. The defense was that the depositor had authorized defendant to loan the money which had been done, but the depositor denied such agreement. It was shown by the evidence that defendant, in fact, made loans which were charged to the depositor's account, and for which he took notes payable to the depositor. *Held,* that a statement made by him to a borrower at the time of making such a loan, which was several years before the making of the alleged false report, to the effect that it was made from money left by the depositor to be loaned, was not admissible as a part of the res gestæ, but was properly excluded as a self-serving declaration.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 805, 808, 810.]

3. SAME—INSTRUCTIONS—ASSUMPTION OF FACT.

An assumption of a fact in the charge to the jury in a criminal case *held* warranted, where such fact was admitted by defendant as a witness.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1985.]

4. BANKS AND BANKING—NATIONAL BANKS—CRIMINAL PROSECUTION OF OFFICER.

Instructions given on the trial of a defendant charged under Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], with having as president of a national bank made a false entry in a report to the Comptroller with intent to defraud, considered, and *held* not erroneous as applied to the evidence.

Ross, Circuit Judge, dissenting.

157 F.—1

In Error to the District Court of the United States for the Eastern Division of the District of Washington.

The plaintiff in error, who was the president and managing officer of the Big Bend National Bank of Davenport, Wash., was convicted of violation of certain of the provisions of section 5209 of the Revised Statutes [U. S. Comp. St. 1901, p. 3497] under the fourth, fifth, sixth, and seventh counts of the indictment. The offenses charged against him in those counts consisted of an alleged false entry in a report required by section 5211 of the Revised Statutes [U. S. Comp. St. 1901, p. 3498] to be made to the Comptroller of the Currency, in that he therein reported to the said Comptroller that on September 9, 1903, there was due by and from the said national bank on account of individual deposits subject to check the sum of $313,131.21, when said entry in said report should have shown the sum to be $329,291.27, and that the discrepancy was due to the fact that he did not include in his said report the sum of $16,160.06 for which the indictment alleged the said banking association was on September 9, 1903, liable upon individual deposit, subject to check to one W. H. Fleet as a depositor in said bank, and that the plaintiff in error inserted such entry in said report with intent to deceive any agent who might thereafter be appointed by the Comptroller of the Currency to examine the affairs of such association, as alleged in the fourth count, and with intent to deceive the directors of said association, as alleged in the fifth count, and with intent to injure and defraud the said W. H. Fleet, as alleged in the sixth count, and with intent to injure and defraud said association and certain persons to the grand jurors unknown, as alleged in the seventh count. It was shown in the testimony, among other things, that in May, 1896, W. H. Fleet had on deposit in the said bank about $11,000. Being then about to leave the country, he went to the plaintiff in error, who was at that time the cashier and manager of the bank, and had a conversation concerning the use of his money then on deposit. He testified that he entered into a definite arrangement with the plaintiff in error whereby he was to leave his money in the bank, and the bank was to allow him 6 per cent. per annum interest thereon. The plaintiff in error testified that Fleet gave him authority to loan out his money which was then on deposit. He acknowledged that no rate of interest was agreed upon, and that no express authority was given to check out the money, but he stated that a general authority was given him to loan out the money. Fleet then left that part of the country. On May 21, 1896, $1,500 was drawn from Fleet's account by a check signed by the plaintiff in error, and made payable to the Triune Gold Mining Company; the signature thereon purporting to be that of W. H. Fleet. On the same day a check, payable to the plaintiff in error and purporting to be signed by W. H. Fleet, was drawn on said bank for $2,781.50. On July 21, 1896, the plaintiff in error caused $1,980 to be loaned to Redhead & Kipp, and charged that sum to Fleet's account. On September 14, 1896, a check for $6,000 was drawn on said bank, payable to the Triune Gold Mining Company, purporting to be signed by W. H. Fleet. All of said checks were paid by the bank and charged to Fleet's account. On August 5, 1899, Fleet's account was credited with $6,000 as paid by the Triune Gold Mining Company, and on the same day there was drawn from his account by a memorandum check $9,645.60 which was paid to the Triune Gold Mining Company. The plaintiff in error signed the name W. H. Fleet to all the checks above referred to, except the last, which was indorsed, "Charge W. H. Fleet," by the cashier of the bank under the direction of the plaintiff in error. On November 19, 1896, Fleet received from the bank a statement showing a balance due him of $9,499.41 from the bank. At that date the books of the bank showed there was due him but $757.81. On September 27, 1897, he received from the bank a statement which showed a balance due him of $12,237.11. On that date the books of the bank showed there was a balance due him of but $3,455.61. On that statement there was indorsed on the credit side thereof the interest to November 1, 1896, $332.41, and thereafter the interest to July 1, 1897, $384.00, and the balance was carried out of $12,953.77. On April 26, 1899, Fleet received from the bank a statement which showed a balance due him of $14,154.06. On that statement, on the credit side thereof, there was thereafter indorsed the interest to June

1, 1899, $302.25, and the sum of $1,140, and the balance was carried out of $15,627.31. All this was done by the plaintiff in error, who also debited thereon, and subtracted therefrom a check drawn on June 3, 1899, for $1,627.31, and brought down a balance of $14,000. On September 3, 1904, the cashier of the bank computed the interest and carried the same out on the said statement in the sum of $3,386.60, and brought down another balance of $17,-386.60. On September 6, 1904, Fleet drew from the bank $386.60, which was the exact amount of the interest at 6 per cent. per annum on $14,000 from the date of the last balance compounded and subtracting from the first year $800, and from the second year $500 which Fleet had drawn out. On May 28, 1900, Fleet wrote a letter to the bank, directing it to send him $800, and charge it to his account. At that time the books of the bank showed a balance in his favor of but $99.65, but the bank honored the order, and did not advise Fleet that his account was thereby overdrawn. On June 24, 1901, Fleet wrote the bank, asking it to send him $500 and charge the same to his account. His account had been closed on the books of the bank on February 16, 1901. The bank nevertheless sent the money without reference to the fact that his account was closed. When the $9,645.60 was checked out by May for the mining company, that company executed a note payable to the order of Fleet, of date July 29, 1899, drawing interest at 10 per cent. per annum, and signed with the name of the company by the plaintiff in error as president. The plaintiff in error testified that, when he withdrew the $2,781.50 from Fleet's account, he executed his own note to Fleet therefor, and that the note had been left by him in his desk at the bank, and could not be found. Fleet testified that he never heard of these loans or notes or checks, and had never received notice that any of his money had been withdrawn for any purpose, except for himself, until after the bank had closed its doors. In sending Fleet the statements of his account, the plaintiff in error instructed the bookkeeper to omit the withdrawals of money above referred to, and caused him to insert in the ledger account in fine pencil figures the dates when these statements were sent to Fleet, and the amounts shown thereon to be the balance due him.

Voorhees & Vorhees, for plaintiff in error.

A. G. Avery, A. E. Gardner, and J. B. Lindsley, for the United States.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). It is assigned as error that the court excluded evidence of certain remarks alleged to have been made by the witness Fleet in a conversation outside of the courtroom during the progress of the trial. It was the contention of the prosecution that Fleet, who was one of the principal witnesses for the government, was on September 9, 1906, a depositor in the bank. The contention of the defense was that Fleet was not then a depositor, for the reason that, on authority given by him to the plaintiff in error, the latter had drawn his money out and loaned it. The witness was asked whether after the adjournment of the court on a certain day he had, in a discussion with others as to the probable ruling of the court on the question of the admission of papers, exclaimed, "damn it, my claim must be properly presented," or "never has been properly presented." It is argued that this evidence, if admitted, would have tended to show bias or prejudice upon the part of the witness. It is the rule in criminal cases to allow wide latitude upon cross-examination in the quest of evidence of bias or prejudice, but this proffered testimony appears to us, as it appeared to the court below, entirely valueless as evidence of bias or prejudice. Assuming that it

was to Fleet's interest to present a claim against the bank, and that he made the remark as suggested in the interrogatory, how would the evidence of that fact have aided the jury in arriving at a verdict? What had the presentation of his claim or the manner of its presentation to do with the question of his bias or prejudice when testifying as a witness?

It is assigned as error that the trial court excluded evidence of statements made by the plaintiff in error to W. C. Kipp at the time when he made the loan to Redhead & Kipp on July 21, 1896, to the effect that the bank was not loaning the money, but that it was money belonging to W. H. Fleet, left with the bank to be loaned. It is contended that the declarations of one accused of crime made at the time and as a part of an act under investigation are always admissible to qualify and explain the act and to show the intent thereof. It is true that the question of the intent of the plaintiff in error in doing the acts charged in the indictment was one of vital importance. If the specific intent charged did not exist, the plaintiff in error was not guilty. But what was the intent which was under investigation? It was the intent which actuated the plaintiff in error at the time of making the statements to the Comptroller of September 9, 1903. Any fact or circumstance which was properly of the res gestæ of that act was admissible in evidence. So, also, any statement which the plaintiff in error might have made in May, 1896, at the time of his conversation with Fleet in regard to the use of his money, would have been admissible. But here the offer was of statements made by the plaintiff in error two months after the date of his conversation with Fleet and nine years before the date when he committed the acts charged in the indictment. The court below properly, we think, excluded such evidence on the ground that the declarations were self-serving, and the proof proffered was of an independent and collateral matter, no part of the res gestæ. If at or prior to the time of making these alleged statements the plaintiff in error had conceived in his mind the plan of loaning Fleet's money without letting him know of it, it was a matter of course that he would make such declarations, for they might be of service to him in the future. At most, the offered evidence would have tended to prove to the jury that the defense which the plaintiff in error relied upon on the trial was no new thought, but had existed in his mind as far back in point of time as July, 1896; but the jury had independent proof of what was in his mind at that time, for there were in evidence the note signed by Redhead & Kipp to Fleet for the money borrowed at that time, and the notes of the Triune Gold Mining Company also made to Fleet. The proof of the declarations so offered in evidence would have added no force to the documentary proof which was in the possession of the jury.

Error is assigned to the ruling of the court on the question propounded to Wilson, the bank examiner, as follows:

"I will now ask you, in a case like this, where the report is in accordance with the books on their face and the books are false, if an account has been closed that should not be closed, then I will ask you how you would, if at all, ascertain the facts, under those circumstances?"

It is argued against this question that it assumed the falsity of the books in the case under investigation. But the district attorney ex-

pressly stated in connection therewith that no reference was made to the present case. We find no merit in the objection. The question went no further than to ask the witness how in a case where it was charged that a false return had been made the fact could be ascertained, if it were a fact that the books were false, when on their faces they accorded with a report to the Comptroller.

Error is assigned to the following instruction:

"It follows, of course, that in considering the case upon those issues which have thus far been mentioned to you that if the defendant was not authorized by W. H. Fleet to loan out his money, and the defendant had no reasonable ground to think so, even if not authorized, that a conviction must follow; and, if he was, no conviction can be had. As to whether the defendant was authorized to loan this money, I charge you that an authority to loan the money would not be an authority to the defendant to borrow it himself. To find with the defendant that he was authorized to loan the money you would also have to find that he was authorized to borrow it, because the authority of an agent to loan presupposes that the agent is to stand in the shoes of the principal, and, as a principal could not borrow money of himself, neither can an agent borrow money of his principal in his hands, or subject to his control, as a trust fund, under a general arrangement to loan the money of the principal."

It is urged against this instruction that it charged the jury to convict the plaintiff in error unless they found that he was authorized to borrow Fleet's money, and that it assumed as an established fact that he had borrowed a part of the money and ignored his testimony to the contrary. The trial court regarded the testimony of the plaintiff in error as an admission in open court that at the time of making the report to the Comptroller a portion of Fleet's money had been borrowed by himself, and in that view we think the court was undoubtedly correct. The plaintiff in error, on his direct examination, acknowledged that he had drawn out $2,781.50 of Fleet's money on a check to which he had affixed Fleet's name, and that he executed his note to Fleet therefor, payable on demand, which note he had retained in his possession, but was unable to produce at the trial. In answer to the question whether he could state the purpose for which that money was used by him, he answered:

"I can. It paid a number of items, but I don't remember. * * *

"Q. I will ask you to state, Mr. May, if you have any recollection as to what became of that money? A. I did not. * * *

"Q. Then you say there was no interest? If there was interest, if there was any charged or credited on the bank books, what would that interest be for? A. There might have been some interest credited to his account by the parties on these loans, by Kipp, the Triune, myself, and others. * * *

"Q. How many loans did you make? A. I made a number.

"Q. State what they were? A. To Redhead & Kipp, to the Triune mine, to myself, and various payments.

"Q. Well, who else besides the Triune mine and yourself? A. I don't think of any one else. * * *

"Q. Then, these only loans that you had out, excepting that Redhead & Kipp that was put back and through the books of the bank, were to yourself and to the Triune mine? A. That is correct. * * *

"Q. Don't you remember the rate of interest you were getting for him from yourself? A. Why I don't believe I figured any interest on myself.

"Q. Oh, he didn't get any interest on yours? A. No; I don't think it, that interest was all to be figured. Mr. Fleet did not want his money, as I understood. He never asked for it. The money was ready at any time he wanted

it. I could have paid that at any moment, and the interest will be figured when the loan is figured."

This evidence shows beyond any question that the $2,781.50 drawn out by the plaintiff in error was borrowed by himself and for himself. Counsel for plaintiff in error point to the following testimony as indicating that there was evidence to the contrary:

"Q. Did you tell Mr. Fleet anything about your going to borrow the money yourself when he left? A. Mr. Fleet was in the East, I guess, or Coulee City. I don't know where he was at the time.

"Q. No; I mean when you made your arrangement? A. No; I never borrowed that money for myself, anyway. I paid that money out to some other people, and gave my note for it."

But this does not contradict the testimony quoted above nor detract from its force. It means, if it means anything, that the plaintiff in error used the money to pay his own obligations to other people. He nowhere attempted to say that he loaned any of that money to others, or that any of it was recoverable from others. He did not even remember to whom he paid it. In view of these solemn admissions made by the plaintiff in error in open court, the trial court was justified in charging the jury as it did. But, for that evidence, the following sentence singled out of the instruction would have been error: "To find with the defendant that he was authorized to loan the money you would also have to find that he was authorized to borrow it"— for the authority to loan does not include the authority to borrow, and the plaintiff in error might have had authority to loan the money without possessing authority to borrow it. But what the court said to the jury by that sentence of the instruction was that, to find with the defendant that he was authorized to loan the money in the way in which he testified that he did loan it, they would also have to find that he was authorized to borrow, because upon his own admission he did borrow a part of the money. The instruction is to be read in connection with other portions of the charge, among which are to be found the following:

"It is a fundamental principle of our law that one charged with crime is presumed to be innocent. * * * If you find the defendant guilty, you must do so from the proofs admitted in evidence which establishes his guilt to your satisfaction beyond a reasonable doubt. * * * It is not sufficient to be satisfied beyond a reasonable doubt as to certain allegations of the indictments, but you must be satisfied beyond a reasonable doubt as to every material matter necessary to constitute the offense or forming an essential part of it. * * * You must find that the defendant purposely, unlawfully, willfully, and intentionally committed the acts before you can convict him, and this applies to every charge which you are to pass upon."

Referring to the deposit by Fleet, the court instructed the jury as follows:

"If he deposited money in the bank and it was withdrawn without his knowledge, or under his direction, or with his consent, then he still had a deposit of that amount of money. * * * If it was not checked out by his authority, or with his knowledge or consent, or with the defendant, honestly believing he had a right to check it out, then it was still an individual deposit. * * * It follows, of course, that in considering the case upon those issues which have thus far been mentioned to you that if the defendant was not authorized by W. H. Fleet to loan out his money and the defendant had no

reasonable ground to think so, even if not authorized, that a conviction must follow, and, if he was, then no conviction can be had."

On the subject of intent, the court charged:

"But the intent with which these acts were done, if you find they were done, is to be particularly observed. * * * It is for you to find beyond a reasonable doubt that it was with the intent to deceive an agent appointed by the Comptroller to examine into the affairs of the bank. * * * The defendant has testified specifically that he had no intent to injure any one or defraud any one, and that you must consider with all the testimony in the case. * * * Therefore you will consider the evidence of the defendant as to his intent having regard to this principle of law, and the acts you find to have been committed, considering his evidence with all the other testimony in the case, giving such credence to his statement that he did not intend to defraud or deceive as you think under the circumstances it is entitled to."

There are several other assignments of error presented in the record which we have examined with care, but which we find it unnecessary to discuss further than to say that we find no reversible error.

The judgment is accordingly affirmed.

ROSS, Circuit Judge. I dissent. Each of the counts upon which the plaintiff in error was convicted related to the same transaction, and was based upon the provisions of section 5209 of the Revised Statutes [U. S. Comp. St. 1901, p. 3497], which is as follows:

"Sec. 5209. Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment or decree; or who makes any false entry in any book, report or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor and shall be imprisoned not less than five years nor more than ten."

It will be seen from the provisions of this statute that a material element of the offense denounced is an intent to injure or defraud the association or any other company, body politic, or corporate, or any individual, or to deceive any officer of the association or the Comptroller of the Currency. Cochran & Sayre v. United States, 157 U. S. 286, 294, 15 Sup. Ct. 628, 39 L. Ed. 704.

The case of the government rested upon a showing that the defendant, who was first cashier and then president of the Big Bend National Bank of Davenport, had, in his report to the Comptroller, wrongfully omitted the deposit of Fleet from among "individual deposits subject to check." The fact of such omission was proved beyond dispute and admitted by the defendant. The defense was that Fleet had authorized the defendant (plaintiff in error here), to loan his money for him, and that, in pursuance of such authority, the defendant had prior to the making of the report drawn out of the bank all

of Fleet's money, and hence that the report was true, and not false. Fleet testified in behalf of the government that he had never given the defendant any such authority. That the defendant had, prior to the making of the report to the Comptroller, drawn out of the bank all of Fleet's money on checks drawn by him, or by his direction, in Fleet's name, was proved by the government by the checks themselves, all of which the defendant admitted. A part of that money was so drawn by the defendant, and, as he claimed, loaned for Fleet to a certain mining company of which the defendant was president, and $2,781.50 of it was so drawn out by the defendant upon a check made payable to himself, and to which he signed Fleet's name, and for which he signed a promissory note in like amount, in Fleet's favor. As has been said, Fleet denied ever having authorized the defendant to make any such disposition of his deposit. In respect to that matter, the defendant testified, among other things, that in the early spring of 1896 Fleet talked with him about the amount of money he had on hand idle, and that the witness suggested to Fleet that he buy some land, saying that he thought land was a good investment; that Fleet stated that he would rather have interest on the money than to have land; that the witness then told Fleet that he could loan his money for him so as to get him a good rate of interest, and would do so if he so desired, and that Fleet asked him to do so; that he subsequently did make various loans of Fleet's money, drawing the same from the bank on checks to which he signed Fleet's name, and in one instance directing an employé of the bank named Lambert to sign Fleet's name.

The defendant further testified that he subsequently rendered Fleet statements of the various loans and of the interest accruing thereon, to which he made no objection. And on behalf of the defendant one Plough was questioned and answered as follows:

"Q. I will ask you to state to the jury if in the latter part of August, 1904, or the 1st of September, 1904, in Davenport, in front of the Lincoln Hotel there, you had a conversation with W. H. Fleet, in which W. H. Fleet said to you: 'I am waiting to have a settlement with Charley May,' or words to that effect? A. He did.

"Q. I will now ask you, Mr. Plough, if at the same time and place you did not say to Mr. Fleet, 'Why, don't you see Lambert,' and if thereupon he did not reply, 'I left my money with May to loan out, and I don't think Lambert knows anything about it,' or words to that effect? A. Yes, sir."

The witness Dillon testified on behalf of the defendant that in the month of February, 1905, at his office in Davenport, Fleet said to him, in the presence of one Caton, that he had told May that he did not like to have so much money in the bank without some return for it, and that he would like to have May loan it for him, or words to that effect. N. C. Caton gave similar testimony on behalf of the defendant. The defendant admitted signing Fleet's name to checks on the bank in favor of the various parties to whom he claimed to have loaned the money, and also to the check in his own favor for $2,781.50, and testified that he signed Fleet's name thereto because he was authorized by him to do so.

Enough has been stated to show that the vital question in the case was whether the defendant was authorized to draw Fleet's money out

of the bank, as he admittedly did, and so the court below told the jury, as appears from this extract from its charge:

"The real controversy as to these four counts (the counts upon which the plaintiff in error was convicted) which relate to the Fleet deposit grows out of the contention of the defendant that he was authorized by Fleet to loan this money, and if you find this to be true, or if you find on that question that your minds are in such a state of uncertainty as to cause a reasonable doubt as to whether he did or not, then the defendant cannot be convicted as to any of the counts relating to the Fleet transaction. That is a question for you to decide from the evidence. It is a vital one in the case, and in deciding it you should take into consideration all the testimony which has been offered, bringing your experience as business men to bear upon the question, and from all the testimony, your own experience, and your best judgment determine where the truth lies. It follows, of course, that in considering the case upon those issues which have thus far been mentioned to you, that if the defendant was not authorized by W. H. Fleet to loan out his money, and the defendant had no reasonable ground to think so, even if not authorized, that a conviction must follow, and, if he was, then no conviction can be had. As to whether the defendant was authorized to loan this money, I charge you that an authority to loan the money would not be an authority to the defendant to borrow it himself. To find with the defendant that he was authorized to loan the money, you would also have to find that he was authorized to borrow it, because the authority of an agent to loan presupposes that the agent is to stand in the shoes of the principal, and, as a principal could not borrow money of himself, neither can an agent borrow money of his principal in his hands or subject to his control as a trust fund, under a general arrangement to loan the money of his principal."

In respect to the check drawn in his own favor, the defendant testified, on direct examination, among other things, as follows:

"A. That was a check for $2,781.50 payable to me.
"Q. Now, Mr. May, I will ask you if there is any book that shows that $2,781.50, other than that check, if there is any other source of information in connection with the item of $2,781.50? A. This would be entered first in the Individual Cash.
"Q. Look at the Individual Cash 8 at page 351, and see how that reads. A. Have you the number of the check?
"Q. Individual Cash No. 8, at page 351? A. That reads, 'Check against the account of W. H. Fleet payable to May $2,781.50.' * * *
"Q. Now, I will ask you, when you drew that money out on that check, what, if anything, you did with reference to indicating that fact and with reference to securing Mr. Fleet the payment of it. A. I executed a note for it.
"Q. Sir? A. I executed a note for it.
"Q. Are you able to produce that note, Mr. May? A. Why, I cannot to-day. I had that note with Mr. Fleet's papers, a complete statement of his account in the envelope with it.
"Q. Where? A. It was in my desk.
"Q. Your desk? A. In my desk at Davenport.
"Q. Now, whereabouts was that desk at Davenport? A. In the Big Bend National Bank Building. * * *
"Q. Now, will you describe to the jury the character of the note which you executed and left there with Mr. Fleet's account in your desk? A. $2,781.50, payable on demand. I have not been able to find any of my papers that were in my desk, not one.
"Q. You have not been able to find any of them? A. It was full of papers of various kinds and of considerable value.
"Q. Do you at this time—can you tell the jury the purpose for which that $2,781.50 were used by you? A. I can. It paid a number of items; but I don't remember.
"Q. In the thousand and one items and matters that went through your head every year and every day and every week would it be possible for you to locate those matters without your papers? A. No; I could not. There were

dozens of items every day passing through my hands. On the statement of Mr. Fleet's account I could trace everything, and I hope to find that. I can trace from the books here the disposition of the moneys. From my own account that I kept, a special account, I could trace the disposition of the moneys after they came into my hands, this $2,781.50."

On cross-examination the defendant testified to the various loans made, as he claimed, for Fleet, and as to his statements to Fleet of the interest accruing thereon; and at one point in his cross-examination as follows:

"Q. How many loans did you make? A. I made a number.

"Q. State what they were? A. To Redhead & Kipp, to the Triune mine, to myself, and various payments.

"Q. Well, who else besides the Triune mine and yourself? A. I don't think of any one else.

"Q. Then, as a matter of fact, as to the unpaid loans, there were only two? A. The unpaid loans?

"Q. The unpaid loans you referred to. There was only two? A. That is correct.

"Q. You are interested in the Triune mine, aren't you? A. No, sir.

"Q. Weren't you at that time? A. I was at that time.

"Q. One of the largest stockholders in it? A. No, sir.

"Q. One of the largest? A. No.

"Q. Is that so? A. That is so.

"Q. You were a stockholder in it? A. Yes, sir.

"Q. Then these only loans that you had out, excepting that Redhead & Kipp, that was put back and through the books of the bank, were to yourself and to the Triune mine? A. That is correct.

"Q. That is all there was to keep track of? A. That is perfectly correct.

"Q. That was all there was to keep track of? A. Yes, sir.

"Q. Now, the number of people then, that these continued loans were to were yourself and the Triune mine. That is two, only two? A. Only two unpaid at the present time.

"Q. How many were paid? A. The Triune mine paid one or two—I am not sure which—and Redhead & Kipp paid theirs.

"Q. Redhead & Kipp? A. Yes.

"Q. The Triune mine, how many did they pay? A. I don't remember how many.

"Q. These entire deals, leaving out Redhead & Kipp, these entire deals were between yourself? You were an officer of the Triune mine? A. Yes, sir.

"Q. President? A. Yes, sir.

"Q. At that time? A. At that time; yes.

"Q. Then you took money as Fleet's agent and paid it to yourself as president of the Triune mine? A. No, sir; paid it to the Triune mine.

"Q. You negotiated both sides of the loan? A. After discussion of the matter with the manager of the mine, yes, sir; and advising him.

"Q. And you negotiated both sides of the loan when you borrowed the $2,781.50? A. Yes, sir.

"Q. Did you tell Mr. Fleet that you had borrowed $2,781 of him? A. He had the checks and notes right before him on the figuration of interest, and Fleet understood thoroughly the whole transaction.

"Q. Did he know it? A. He did.

"Q. Well, what had that to do with the figuration of interest, what rate of interest did you figure? A. I couldn't tell you now. I don't remember.

"Q. Don't you remember the rate of interest you were getting for him from yourself? A. Why, I don't believe I figured any interest on myself.

"Q. Oh, he didn't get any interest on yours? A. No; I don't think it. That interest was all to be figured. Mr. Fleet didn't want his money, as I understood. He never asked for it. The money was ready at any time he wanted it. I could have paid that at any moment, and the interest will be figured when the loan is figured."

The defendant also testified in respect to the same subject as follows:

"Q. You say that you are not certain about any of the figures of interest. Is that what I understand you to say? A. That is perfectly correct. I couldn't tell you what the items of interest are based upon, because it does not state here.

"Q. Well, was it on the Triune note? A. It was on loans that I had out for him, whatever it was at that time.

"Q. Well, what loans did you have out for him at that time? A. I would have to look at the books to see.

"Q. Was there anything except the Triune? A. I think there was $2,781 that I paid out to somebody that I gave my note for.

"Q. That is the $2,781 you took from Fleet's account? A. That is correct. * * *

"Q. Did you tell Mr. Fleet anything about your going to borrow the money yourself when he left? A. Mr. Fleet was in the East, I guess, or Coulee City. I don't know where he was at the time.

"Q. No; I mean when you made your arrangement? A. No; I never borrowed that money for myself anyway. I paid that money out to some other people, and gave my note for it.

"Q. You took it out? A. Yes, sir.

"Q. And you don't know what you did with it I remember you said on your direction? A. I can't remember all the items."

The defendant testified that, in addition to Fleet's account on the books of the bank, defendant kept a special account between himself and Fleet, which showed all details of the various transactions, which account had disappeared with other papers from his desk that was kept in the bank. The defendant was also questioned, and answered as follows:

"Q. I ask you in that connection, Mr. May, to explain to the jury why it was that in this scheme of bookkeeping, keeping track of Mr. Fleet's money, you instructed the bookkeeper to make this account up showing by it only such items as Mr. Fleet had personal touch with—what was your reason for that? A. I wanted Mr. Fleet to know at all times the amount of money that he had, the total in the bank, and what I had loaned for him, in my hands for loaning, that I had loaned and the total amount that was in bank subject to my check to loan. * * *

"Q. Now, you stated, did you not, that you had asked Mr. Imus to put this pencil balance in here in the ledger for the purpose of keeping Fleet in touch with the details, did you not? A. The items in pencil would be to—those are the balances on those certain dates, including what I had loaned, and what was in the bank, without reference to what the books show is in the bank, or without reference to what I have out.

"Q. Did that have any reference whatever to the bank books? A. Why, it most assuredly shows the totals in and out.

"Q. In and out? A. Money loaned, without referring to the individual item. * * *

"Q. Then tell me what that statement was for rendered on that day? A. It was for the purpose of advising Mr. Fleet that including the cash in bank, and including all money that I had loaned, that he would have a balance of so much, whatever it was.

"Q. Including the cash you had loaned and the cash in bank? A. Cash in bank and cash loaned, the total.

"Q. How much cash was there in the bank then? A. There was nothing in the bank. There was more loaned than at some former time. * * *

"Q. You are ready, you say, for a final settlement at any time? A. Yes, sir.

"Q. When you have that final settlement, how much interest (do you) propose to allow Mr. Fleet? A. Every quarter of a dollar on all of the money that I have loaned out for him, less the amount of interest that has been actually paid him. * * *

"Q. You said, Mr. May, in answer to a question by the United States Attorney, when he asked you, 'Lambert knew all about it, did he?' meaning the Fleet account, and you said that he knew all about your loaning the money, tell the jury when you first told Mr. Lambert that you were loaning Mr. Fleet's money, and that you had authority to do so, if at all. A. Oh, it was immediately after my arrangement with him and before a loan was made, before this $2,781.50 and the $1,500 loan was made."

In passing upon the instructions in question, it is no more permissible for us to weigh contradictory or inconsistent statements of witnesses, or statements from which legitimate inferences may be drawn, and determine on which side the evidence preponderates on any controverted question of fact, than it was for the trial court to do so. All such matters were for the jury, and not the court. Hickman v. Jones, 9 Wall. 197, 19 L. Ed. 551; Barney v. Schmeider, 9 Wall. 248, 19 L. Ed. 648; Bank of Washington v. Triplett, 1 Pet. 31, 7 L. Ed. 37. The defense was based upon the claimed authority of the defendant to loan Fleet's money. If such authority was in fact given, then clearly the defendant could not be legally convicted, as the court below distinctly told the jury; and, since an intent to injure, deceive, or defraud is one of the essential elements of the offense charged against the defendant, if he honestly and in good faith believed that Fleet had given him such authority, and acted upon such belief in drawing from the bank all of Fleet's money, he could not be guilty under the counts in question, because of a lack of a criminal intent made by the statute essential to the offense denounced. To this effect, also, the court below correctly instructed the jury. But the court, in the same connection, proceeded to specifically instruct them as follows:

"As to whether the defendant was authorized to loan this money, I charge you that an authority to loan the money would not be an authority to the defendant to borrow it himself. To find with the defendant that he was authorized to loan the money, you would also have to find that he was authorized to borrow it, because the authority of an agent to loan presupposes that the agent is to stand in the shoes of the principal, and, as a principal cannot borrow money of himself, neither can an agent borrow money of his principal in his hands, or subject to his control, as a trust fund under a general arrangement to loan the money of the principal."

While it is true, as a mere matter of law, that authority from Fleet to the defendant to loan his money would not be authority to the defendant to borrow it himself, it is not true that there could be no authority from Fleet to the defendant to loan his money unless the defendant was also authorized to borrow it. This specific charge not only ignored the question of the defendant's intent, but the court further distinctly charged that, in order for the jury to find that the defendant was authorized to loan Fleet's money, they would also have to find that he was authorized to borrow it; and, since the jury had immediately before been instructed that authority to loan the money would not be an authority to the defendant to borrow it, this was plainly equivalent to charging them that they could not find that the defendant was authorized to loan it—thus, in effect, wiping out the entire ground upon which the defense rested. The defendant, as has been said, testified in his own behalf that he was authorized by Fleet to loan his money, and that his actions in that regard were based upon

that authority, and were without any intent to injure, deceive, or defraud any one, and were subsequently brought to the attention of Fleet, and not objected to by him. He also gave some testimony from which it is strenuously contended in his behalf, and from which it might possibly be inferred, that, although he drew from the bank the $2,781.50 in his own name and gave his own promissory note for it, that money was not, in fact, borrowed for himself. While all of those contentions were, it is true, positively controverted by the testimony and evidence given on the part of the prosecution, it is clear that in testing the instructions evidence tending to support the defense must be assumed to be true. Ranney v. Barlow, 112 U. S. 207, 5 Sup. Ct. 104, 28 L. Ed. 662.

I am not unmindful of the well-established rule that in considering instructions the whole of them must be read and considered, and that it is not permisisble to take a single sentence and consider it without reference to the context and the remainder of the charge. That is undoubtedly a sound and most wholesome rule, and has been frequently applied by us in cases where it could be seen that the jury could not have been misled, but had been fully and fairly instructed. It should, however, always be remembered that jurors are taken from various walks and stations in life, and that, even if they were always competent to do so, they must decide in a space of time far too short for any nice or critical weighing of the various words and clauses of the instructions. Hence the necessity for accuracy and clearness in them, especially when dealing with the life or liberty of an individual. In the beginning of the charge here in question, which is a very long one, the court told the jury that such opinions respecting the evidence as it had, or should express, were not to be taken or acted on by the jury unless in accord with their own views, and that they were to determine the facts, from the evidence, for themselves irrespective of any such opinions of the court; and upon the question of intent the court in one portion of its charge said:

"The defendant has testified specifically that he had no intent to injure any one or defraud any one, and that you must consider with all the testimony in the case. But I charge you that if you find that the defendant did, without the knowledge and consent of Fleet, loan this money out and took it out of his account, and then reported it to the Comptroller as in effect a closed account by omitting it from the individual deposits subject to check, that the intent with which it was done is presumed, and in weighing the intent the rule of law is that one committing an act which is violative of the law must be held to have contemplated the results which naturally flow from such act. Therefore you will consider the evidence of the defendant as to his intent having regard to this principle of the law and of the acts you find to have been committed, considering his evidence with all the other testimony in the case, giving such credence to his statement that he did not intend to defraud or deceive as you think, under the circumstances, it is entitled to, and giving such weight to the other proof as you think it deserves."

The difficulty is that, when the court below came to single out the most vital question in the case, it charged the jury in the most positive and absolute terms that the defendant could not have been authorized to loan Fleet's money unless he was also authorized to borrow it, which was not only bad law, but took from the jury the consideration of the testimony on the part of the defendant tending to show that he was

authorized by Fleet to loan his money, and that he drew it all from the bank for that purpose and pursuant to that authority prior to the time of making the report upon which the indictment is based, and that he did so without intent to injure, deceive, or defraud any one, relying upon Fleet's authority for his actions.

In speaking of a similar question, the Supreme Court said in the case of McLanahan v. Universal Insurance Company, 1 Pet. 170–181, 7 L. Ed. 98:

"A suggestion has been thrown out at the bar that this instruction was not intended to be positive and absolute, but merely advisory to the jury, that it was not meant to take away the right of the jury to decide freely on the facts; but merely to offer for their consideration those views which the court had arrived at, and which it might at all times properly suggest to the jury. It is doubtless within the province of a court, in the exercise of its discretion, to sum up the facts in the case to the jury, and submit them, with the inferences of law deducible therefrom, to the free judgment of the jury. But care should be taken in all such cases to separate the law from the facts, and to leave the latter, in unequivocal terms, to the jury, as their true and peculiar province. We do not, however, understand that the present instruction was, in fact, or was intended to be, merely in the nature of advice to the jury. It is couched in the most absolute terms, and imposed an obligation upon the jury to find a verdict for the defendants. It assumed there were no disputable facts or inferences proper for the consideration of the jury upon the merits; and that upon the unquestioned facts the plaintiffs had no legal right of recovery."

See, also, Bank of Washington v. Triplett, 1 Pet. 31, 7 L. Ed. 37; Starr v. United States, 153 U. S. 628, 14 Sup. Ct. 919, 38 L. Ed. 841; Adams v. Roberts, 2 How. 486, 11 L. Ed. 349; Vigel v. Naylor, 24 How. 208, 16 L. Ed. 646.

For the error above pointed out, I think the judgment should be reversed and the cause remanded to the court below for a new trial.

NOTE.—The following is the opinion of Whitson, District Judge, on motion for new trial:

WHITSON, District Judge. 1. (a) It is assigned as error that the court treated the crimes defined by section 5209 Rev. St. [U. S. Comp. St. 1901, p. 3497]· as misdemeanors, while they should have been regarded as felonies. If this position is correct, error was committed in limiting the number of the defendant's challenges to three. To make this position tenable, it must appear that Congress had no power to declare those offenses for which the defendant was prosecuted misdemeanors. "It is well settled that there are no common-law offenses against the United States." United States v. Eaton, 144 U. S. 687, 12 Sup. Ct. 764, 36 L. Ed. 591. The acts charged against the defendant became crimes purely by virtue of section 5209. Congress declared the acts therein mentioned to be offenses, and it defined them as misdemeanors. True, the punishment is such as sometimes attends a felony; but that was a matter for legislative consideration, and not for judicial determination. If Congress had the power to make these acts crimes against the United States, it had power to define the crimes, and, having done so, nothing has been pointed out which would justify the court in holding that it indulged an excess of its power by enacting the statute. It has been held that the offenses defined in section 5209 are misdemeanors, and that a defendant is thereby limited to three peremptory challenges. Jewett v. United States, 100 Fed. 832, 41 C. C. A. 88, 53 L. R. A. 568; Tyler v. United States, 106 Fed. 137, 45 C. C. A. 247. It is true that the Supreme Court in Re Claasen, 140 U. S. 204, 11 Sup. Ct. 735, 35 L. Ed. 409, has expressly held that the crimes defined by this section are "infamous"; but, in so far as the matter has been called to my attention, I do not find that the court has drawn the conclusion

that because the crimes are infamous Congress has no power to declare the degree of the offenses. To the contrary is the following: "There are therefore no felonies against the United States except those expressly declared to be such by act of Congress. It has not been the policy of Congress to multiply felonies. Comparatively few offenses are declared to be felonies. As a general rule, offenses against the United States are misdemeanors punishable by imprisonment, by fine and imprisonment, by fine or imprisonment, or by fine alone. If punishable by fine alone, the offenders may be proceeded against by indictment for the fine or by action of debt for the penalty. Therefore a very large number of offenses against the United States may be tried in the absence of the accused, if his counsel be present." United States v. Shepherd, Case No. 16,274, 27 Fed. Cas. 1060. It would seem to follow that, if offenses against the United States can only be created and defined by Congress, it is an inherent incident of such power to declare whether offenses created by it are felonies or misdemeanors. This, to my mind, effectually disposes of the contention that the court erred in following the express provisions of section 819, Rev. St. [U. S. Comp. St. 1901, p. 629], which limits a defendant on trial for misdemeanor to three peremptory challenges.

(b) In this connection, it is proper to consider the error assigned on account of the defendant leaving the courtroom during the progress of the trial. The courtroom is entered from a large hall or corridor. The opening through which entrance is made, from appearances, was originally an archway connecting the hall or corridor with the room at present occupied for court purposes. That archway was 12 feet in width. Double glass doors of the ordinary size were put in, and to fill the rest of the space a long transom was placed over the doors covering the full width of the original opening, and sashes with glass were placed on either side of the double doors. This is what occurred: While the United States Attorney was reading from an exhibit which had already been admitted in evidence, it was discovered that the defendant had left the courtroom without the knowledge of the court. He was immediately outside of the doors referred to, and, as soon as the attention of the court was called to it, proceedings were at once stopped and the defendant was called in. His counsel were interrogated whether they made any question concerning the absence of the defendant who answered in the negative, and, of course, no exception was taken. If objection had been made at the time, it would have been open to the court to have required the reading of the figures from the exhibit which had been read in the defendant's absence, or to have discharged the jury, impaneled a new one, and proceeded with a new trial. The defendant was out on bail. He deliberately left the courtroom and was absent but a few minutes. It may well be doubted whether he was absent from the trial at all for the brief period that he stood immediately outside of the courtroom doors, within the meaning of the general rule in felony cases that no action can be taken against a defendant in his absence. People v. Bush, 68 Cal. 623, 10 Pac. 169. If he was absent within the meaning of that rule, he voluntarily absented himself, and he was not in the least prejudiced by what occurred during such absence. As to the affidavits that the defendant was out of the courtroom twice, the court would under ordinary circumstances unhesitatingly accept the testimony of witnesses not impeached as to extrinsic matters. It is possible that the defendant was out of the courtroom twice, but I do not believe it, and I am confirmed in this belief by the affidavits of the officers who corroborate my own remembrance. The rule that a defendant being tried for a felony is entitled to be present is for his protection. It was intended as a limitation upon the power of the court to proceed against him in his absence, and it was not made for the benefit of one who deliberately absents himself, and particularly where no prejudicial error can be pointed out.

It is argued by counsel that in felony cases error is presumed. In other words, that a defendant cannot by himself or by counsel waive the right to be personally present during the trial, and this is not only familiar law, but has been expressly declared by the Supreme Court of the United States in numerous cases. Lewis v. United States, 146 U. S. 372, 13 Sup. Ct. 136, 36 L. Ed. 1011; Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262. But it has been declared by courts of high standing that where the absence has

been brought about by the defendant, as in the case of flight, or the like, that such a person is not within the spirit or letter of the rule. O"Toole v. State, 40 Tex. Cr. R. 578, 51 S. W. 244; Doyle v. Commonwealth, (Ky. Court of Appeals) 37 S. W. 153; Hill v. State, 17 Wis. 675, 86 Am. Dec. 736; Peterson v. State, 64 Neb. 875, 90 N. W. 964; 1 Bishop's New Crim. Proc. § 266. The inquiry as to whether there are exceptions to the general rule need not be followed further, for, if the statute has been misconstrued by holding that the acts charged against the defendant are misdemeanors, error has been committed in any event. Adhering to the view that these acts are misdemeanors, it is necessary to inquire whether the rule prevails as to such offenses:

In Lewis v. United States, page 372 of 146 U. S., page 136 of 13 Sup. Ct. (36 L. Ed. 1011), the court refers to the relaxation of the rule in cases of misdemeanors. Bishop, in his New Criminal Procedure (volume 1, § 266) says: "Ordinarily and by most opinions one may waive his right, if the prosecuting attorney and the court do not object, to be present at any steps in a misdemeanor case." In United States v. Santos, 27 Fed. Cas. 954, No. 16,222, the court said, referring to the defendant: "The case being a misdemeanor, it was competent to proceed with the trial during his absence." The cases above cited as holding that they are exceptions to the general rule are particularly in point. Some of them are felony cases. Some are cases of misdemeanor. The best considered seem to hold that in cases of misdemeanor it is not necessary that the defendant be present during the proceedings, particularly if he absents himself voluntarily without the knowledge of the court, and so it must be held in this case. Counsel argue that the case of United States v. Peters, 94 Fed. 127, 36 C. C. A. 105, is an authority for holding that offenses under section 5209 are felonies, but that question was never before the court. In discussing that case the court assumed, but it did not decide, that the nature of the charge was such as at all times to require the presence of the defendant. There is nothing in the opinion to indicate anything to the contrary, and the abbreviated quotation made of the section shows that the court did not consider that question at all.

2. It is contended that there was error in charging the jury. The ideal charge has yet to be written, that is, a charge which able and ingenious counsel cannot criticise with more or less force of reasoning. It is not to be supposed that the judge of this court so early in his judicial career would have been able to put the charge in this case above criticism when so many eminent judges of long experience on the bench have failed in that regard. Counsel's principal assignment of error on the charge is that this language was used: "It follows, of course, that in considering the case upon those issues which have thus far been mentioned to you, that if the defendant was not authorized by W. H. Fleet to loan out his money, and the defendant had no reasonable ground to think so, even if not authorized, that a conviction must follow, and, if he was, then no conviction can be had. As to whether the defendant was authorized to loan this money, I charge you that an authority to loan the money would not be an authority to the defendant to borrow it himself. To find with the defendant that he was authorized to loan the money, you would also have to find that he was authorized to borrow it, because the authority of an agent to loan presupposes that the agent is to stand in the shoes of the principal, and, as a principal could not borrow money of himself, neither can an agent borrow money of his principal in his hands, or subject to his control as a trust fund, under a general arrangement to loan the money of the principal." The objection to this is that it was assumed that the defendant borrowed a part of the Fleet money. Time will not permit an extended quotation from the testimony of the defendant. It will suffice for the purposes of the motion to say that the ability displayed by counsel in arguing this question has not convinced me that there was any evidence that the defendant did not borrow the money. His explanation that he used it for certain purposes and borrowed it for other people does not shake me in the opinion formed from his oft-repeated assertions, acknowledgments, and recognition of that fact. Merely saying that he borrowed it for somebody else in no way affects the fact, which is that he took the money and gave his own note for it. The rule for which counsel contends, and which is well settled, namely, that the court cannot take away from the jury contro-

verted questions of fact, applies in its full force where there is a contention by a party on the one hand, or evidence of some witness to one state of facts which contradicts the evidence of another witness, even though that contradiction may be very slight. It ought not to apply in its full force, and apparently, it does not so apply to the solemn admission of a party made in giving his testimony. To make this idea better understood, it is only necessary to reverse the situation. Suppose that the guilt of the defendant depended upon the question of his having borrowed the money of Fleet, could the court have submitted that question to the jury for a finding, or would it have been compelled to take the case from the jury? An examination of the defendant's testimony will make it readily appear that the court would have been compelled to tell the jury that there was no conflict of evidence, and that they could not convict the defendant. The assumption that there was a conflict of evidence upon that question inheres in every objection which counsel make to that part of the charge. The well-established rule is that parts of a charge are not to stand alone, but the whole must be considered, and, while fully recognizing the doctrine contended for by counsel that anything which withdraws from the jury evidence tending to support a defense is erroneous, it does not appear that there was prejudicial error in this regard. The argument of counsel construes the charge literally. It ignores the context and the subject-matter upon which the jury was being charged. The jury was in effect told that, inasmuch as the defendant made his defense upon the contention that he was authorized by Fleet to loan his money, that defense was not established by proof that the defendant borrowed it himself. His defense was that he was authorized to loan Fleet's money. He sought to sustain that defense by showing that he had borrowed a part of it and loaned a part of it. Perhaps the thought was not altogether happily expressed, but that it misled the jury, or could have misled it when taken in connection with the language which immediately preceded that which counsel quotes, I cannot bring myself to believe. That language was as follows: "The real controversy as to these four counts, which relate to the Fleet deposit, grows out of the contention of the defendant that he was authorized by Fleet to loan this money, and if you find this to be true, or if you find on that question that your minds are in such a state of uncertainty as to cause a reasonable doubt as to whether he did or not, then the defendant cannot be convicted as to any of the counts relating to the Fleet transaction. That is a question for you to decide from the evidence. It is a vital one in this case, and in deciding it you should take into consideration all the testimony which has been offered, bringing your experience as business men to bear upon the question, and from all the testimony, your own experience, and your best judgment determine where the truth lies." It is said that the jury were arbitrarily told that they must find authority to borrow or convict the defendant; but it takes a good deal of study and construction and effort to arrive at that conclusion. Besides, only a part of the money was borrowed by the defendant, and in the very paragraph which counsel complains of the jury were told that there could be no conviction if the defendant was authorized to loan Fleet's money, so that the instruction that authority to loan was not authority to borrow could not in any event have been prejudicial to the defendant. It was never stated at the trial by way of oral argument, nor by way of request for instructions, that the evidence of the defendant in relation to settlement with Fleet was a ratification of his act as now for the first time contended, even though it may not have been authorized, but that evidence was offered by the defendant to establish his own authority, and that was the theory upon which the case was tried.

In this connection, also, it is said that the court should have charged the jury that, if the defendant believed he had authority to loan the money, he should be acquitted. That question was covered by telling the jury that, if he had reasonable ground to believe so, he should be acquitted. Even in the defense of a charge of murder, where the defendant seeks to show that he acted in self-defense, he must show that he relied upon appearances, and that he had reasonable ground to rely upon them. It is not sufficient to say that he believed that deceased was about to kill him. He must show that he had some ground for believing so. Any defendant will say that he believed that

he had the right to do a thing when on trial for doing it. That is no excuse. What he must show is that he had some ground for belief. But in the same connection the jury was told that, if they had a reasonable doubt as to whether Fleet authorized the defendant to loan the money, they must acquit.

3. The exclusion of the evidence of witnesses who would have testified, had they been permitted, that the defendant, at the time he loaned the money, declared that he was loaning the money of Fleet, is assigned as error. When this testimony was offered, it was suggested that it was part of the res gestæ. Just when an act or declaration is a part of the res gestæ is sometimes extremely difficult to determine. When this question was presented during the trial, it was concluded that in this case the defendant was speaking of the facts, rather than the facts speaking through the defendant. The charge related to the falsification of a report to the Comptroller of the Currency. The prosecution offered evidence tending to prove that Fleet had an account in the bank. Inded, that was never a disputed fact in the case, except in so far as all facts are put in issue by a plea of not guilty. In offering proof tending to establish the deposit of Fleet, the prosecutor was compelled to go back to the time when the bank books showed the deposit, and follow the account through the books until it was closed, thus incidentally showing the checks by means of which the account was drawn out. Remembering that the charge was falsification of the books and showing that Fleet did have an account there, it did not seem to me at the trial that the fact that the defendant was authorized to loan the money, and his loaning thereof was a part of the res gestæ, nor does it seem so yet. It must be admitted, however, that this matter is not altogether free from doubt. But, for the fact that the ruling made at the time is to my mind clearly sustainable upon another theory, the question as to whether the declaration of the defendant as to the loaning of Fleet's money was a part of the res gestæ might receive more careful consideration. If the defendant's liberty depended upon that ruling alone, it might be one of sufficient uncertainty and doubt to justify the granting of a new trial, even though the evidence would have been cumulative, but the declarations of those witnesses who borrowed money would have in no way added to the admitted fact that the defendant did loan the money and took the securities in the name of Fleet. If the tender of proof was intended to go to the extent of showing declarations made by the defendant generally that he was loaning Fleet's money, it is perfectly clear that they could not, in any event, have been a part of the res gestæ, but were purely self-serving, and evidence relating to the declarations made at the time the money was loaned to those borrowing it could in no way add to that which the papers relating to the transaction disclosed and which must be conclusively presumed to have been known by the borrowers who signed the obligations which were payable to Fleet. The taking of those obligations in the name of Fleet disclosed all there was of the transaction, and it unavoidably brought before the jury the declarations that the defendant made at the time; that is to say, it would not have strengthened the defendant's contention to have allowed a borrower to testify that he told him he was loaning Fleet's money when the note which he executed showed that upon its face, particularly when the testimony of the defendant as to that matter was never contradicted. In that view the declarations of the defendant were simply repetitions. This view also disposes of the contention that the declarations of the defendant were competent as proof of his agency, a suggestion which is now made to the court for the first time by the motion for a new trial.

4. It is claimed that the verdict as submitted to the jury was so uncertain and irregular as to render it void. Counsel on both sides, after an examination, approved it as to form, and it was sent to the jury in pursuance of such affirmative action. Beyond this, I have not discovered any ground for the charge that it was uncertain or misleading, and certainly the jury found no difficulty in understanding it perfectly. There were 23 counts in both indictments, the two causes having been consolidated, and 18 of those counts were eliminated for one cause or another. As to those counts upon which the jury was peremptorily instructed to return a verdict of not guilty, the verdict was fully completed. Upon those counts submitted to the jury a blank was left before the word "guilty," with instructions, if they found the defendant

not guilty, to insert the word "not" before the word "guilty," as to each of the counts on which they so found; but, if they found the defendant guilty as to those counts, to sign the verdict without writing in the word "not." That the jury fully understood this is shown by the verdict itself, where they used the word "not" as to one count, but did not use it as to the others. To have prepared and sent to the jury every possible combination of verdict which they might have found would have been far more confusing and irregular than to have sent it to the jury in the manner in which it was submitted.

It follows that the motion for new trial must be overruled, to which the defendant will be allowed an exception.